LARSON ZIRZOW & KAPLAN, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzklegal.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzklegal.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fax: (702) 382-1169

Attorneys for Alleged Debtor

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: 18-50412-gwz |
| | Chapter 11 (Involuntary) |
| MEDIZONE INTERNATIONAL, INC., | |
| Alleged Debtor. | Date: August 2, 2018 |
| | Time: 10:00 a.m. |

**MOTION FOR INTRA-DISTRICT TRANSFER OF INVOLUNTARY CHAPTER 11**
**CASE TO COURT WHERE VOLUNTARY CHAPTER 7 CASE IS PENDING**

Medizone International, Inc., a Nevada corporation ("Medizone"), hereby files its motion for an intra-District transfer of the above entitled involuntary chapter 11 proceeding (the "Involuntary Case") to the informal Southern Division of the U.S. Bankruptcy Court for the District of Nevada where MediZone is filing its own voluntary chapter 7 bankruptcy case (the "Voluntary Case") and in a more approriate forum. In support of this Motion, MediZone respectfully represents as follows:

1.      On April 18, 2018 (the "Petition Date"), Edwin G. Marshall and Dr. Jill C. Marshall (collectively, the "Marshalls"), and Ushio America, Inc. (together with the Marshalls, the "Petitioning Creditors"), filed an involuntary petition (the "Involuntary Petition") [ECF No. 1] under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") against Medizone, thereby commencing the above-captioned Involuntary Case.

2.      On April 20, 2018, the Petitioning Creditors filed an amendment to their

Involuntary Petition [ECF No. 16].

3.    MediZone is a public company (OTCQB:MZEI) that is a manufacturer of a disinfectant technology called the AsepticSure® System for use in both healthcare and non-healthcare facility disinfecting systems.

4.    The Marshalls are former insiders of MediZone. Specifically, Mr. Marshall was the former Chairman and Chief Executive Officer for more than a decade, and Mrs. Marshall was the former Director of Operations for the company.

5.    As reported in MediZone's public filings with the U.S. Securities and Exchange Commission, and principally in the company's Form 8-K current report dated as of February 22, 2017, the company entered into Separation and Release Agreements (the "Separation Agreements") with the Marshalls, true and correct copies of which are attached hereto as **Exhibit 1**, and judicial notice of which are respectfully requested pursuant to Fed. R. Evid. 201. The claims arising from the Separation Agreements form the basis of the Marshalls' claims as pled in support of their Involuntary Petition.

6.    Importantly, Section 9(c) of the Marshalls' Separation Agreements provided the following:

> All disputes and controversies arising out of or in connection with this Agreement shall be resolved exclusively by the <u>state and federal courts located in Clark County in the State of Nevada</u>, and each party hereto agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts. Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which such party may raise now, or hereafter have, to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Each party agrees that, to the fullest extent permitted by applicable law, a final judgment in any such suit, action, or proceeding brought in such a court shall be conclusive and binding upon such party, and may be enforced in any court of the jurisdiction in which such party is or may be subject by a suit upon such judgment.

(emphasis added).

LARSON ZIRZOW & KAPLAN, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON ZIRZOW & KAPLAN, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

7.     In direct contravention of the forum selection and dispute resolution provisions of their Separation Agreements, and obviously well aware from their prior experience with the company that MediZone had no connection to Northern Nevada, the Marshalls filed their Involuntary Petition listing the informal Northern Nevada/Reno division of the U.S. Bankruptcy Court for the District of Nevada as the appropriate forum, and apparently because it is a shorter trip for their main counsel who is located in San Francisco, and/or the Marshalls, who reside in the outskirts of San Francisco.

8.     MediZone has no operations in Nevada; rather, its principal place of business is in Kalamazoo, Michigan.  In fact, MediZone's only connection to Nevada is that it was incorporated in Nevada.

9.     As a result of the Petitioning Creditors' filing of the Involuntary Case, which also resulted in events of default and the loss of potential funding, MediZone's Board of Directors had at least several meetings and as a result of the company's legal, financial and practical realities, and in a proper exercise of its business judgment, filed a voluntary chapter 7 bankruptcy case on behalf of the company  in the U.S. Bankruptcy Court for the District of Nevada, but in the informal Las Vegas division and for a variety of reasons, including but not limited to in proper observance of the dispute resolution provisions in the Separation Agreements with the Marshalls, and also the lack of any other guidance on the appropriate forum in Nevada.

10.     The chapter 7 trustee over Medizone in the Chapter 7 Case will have assumed full control over the administration of the case and the Debtor's estate, and will presumably intervene as the real party in interest in the instant motion.

11.     The venue analysis begins with reference to the applicable statutes and rules.  The bankruptcy venue statute, 28 U.S.C. § 1408, provides that:

> [A] case under title 11 may be commenced in the district court for the district—
>     (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement ...; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

12.    As the Debtor is incorporated under the laws of the State of Nevada, venue for both cases in Nevada is proper pursuant to 28 U.S.C. § 1408(1).

13.    A sister provision to Section 1408, 28 U.S.C. § 1412, provides that the Court "may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." While Section 1412 does not directly address the circumstances before the Court, i.e. two bankruptcy petitions pending against the same debtor in different jurisdictions, Fed. R. Bankr. P. 1014(b) provides more precise guidance:

> Procedure when petitions involving the same debtor or related debtors are filed in different courts. If petitions commencing cases under the Code or seeking recognition under chapter 15 are filed in different districts by, regarding, or against (1) the same debtor, (2) a partnership and one or more of its general partners, (3) two or more general partners, or (4) a debtor and an affiliate, the court in the district in which the first-filed petition is pending may determine, in the interest of justice or for the convenience of the parties, the district or districts in which any of the cases should proceed....

14.    It is up to this Court, as the court in which the first-filed bankruptcy petition is pending, to make the determination pursuant to Fed. R. Bankr. P. 1014(b) as to the jurisdiction in which the Voluntary and Involuntary Cases should proceed. "The decision of whether to transfer venue is within the court's discretion based on an individualized case-by-case analysis of convenience and fairness." In re Enron Corp., 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002) (citing cases); In re Patriot Coal Corp., 482 B.R. 718, 739 (Bankr. S.D.N.Y. 2012). The decision to determine venue pursuant to Rule 1014(b) likewise lies within the Court's sound discretion.

15.    Rule 1014(b), tracking the language of Section 1412, sets forth a flexible, dual-track test in which the Court may determine the venue in which the Voluntary and Voluntary Cases should proceed based on (1) the interest of justice or (2) the convenience of the parties. "It has been observed that § 1412 is . . . written in the disjunctive, making transfer of venue appropriate either in the interest of justice or for the convenience of the parties, and that this statutory provision creates two distinct analytical bases upon which transfer of venue may be grounded." In re

4

LARSON ZIRZOW & KAPLAN, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Qualteq, Inc., No. 11-12572, 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012) (emphasis in original).  The particular situation in the case at hand is similar to the situation discussion in In re Caesars Entm't Op. Co., Inc., Case No. 15-10047 (KG), 2015 WL 495259 (Bankr. D. Del. Feb. 2, 2015).

16.     As applied in the case at hand, the best interests of all is to allow the Las Vegas-based Chapter 7 Trustee in the Voluntary Case to do his or her job, as a neutral, to maximize any remaining recoveries for the creditors.  Additionally, with respect to the Marshalls in particular, as the leading charge in the Involuntary Case, they have specifically contracted to have matters resolved in Las Vegas, Clark County, Nevada.  Finally, the Debtor's counsel is also based in Las Vegas.

17.     Ultimately, once the Involuntary Case is transferred, it is assumed that the Involuntary Case will be dismissed in favor of the Voluntary Case, which will already be well underway with a 341 meeting noticed out via BNC to all creditors and parties in interest (unlike this Involuntary Case), including the thousands of shareholders of MediZone.

WHEREFORE, Medizone respectfully request that the Court grant this Motion, thereby transferring venue of the Involuntary Case to the informal Southern Nevada/Las Vegas Division of Nevada, so that that Court overseeing the company's Voluntary Chapter 7 Case, and the Chapter 7 Trustee therein can determine whether to ultimately dismiss the Involuntary Case in favor of the Voluntary Case.

Dated:  May 8, 2018

By:  /s/ Matthew C. Zirzow
LARSON ZIRZOW & KAPLAN, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
850 E. Bonneville Ave.
Las Vegas, Nevada 89101

Attorneys for Alleged Debtor

# EXHIBIT 1

8-K 1 medizone8k022517.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): February 22, 2017

# Medizone International, Inc.
(Exact name of registrant as specified in its charter)

| **Nevada** | **2-93277-D** | **87-0412648** |
|:---:|:---:|:---:|
| (State or other jurisdiction | (Commission | (IRS Employer |
| of incorporation) | File Number) | Identification No.) |

**350 East Michigan Avenue, Suite 500, Kalamazoo, MI 49007**
(Address of principal executive offices, Zip Code)

Registrant's telephone number, including area code: **(269) 202-5020**

**4000 Bridgeway, Suite 401, Sausalito, California 94965**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*(b)  Resignation of Officer and Director*

On February 22, 2017, Edwin G. Marshall, Chief Executive Officer and Chairman of Medizone International, Inc. (the "Company") informed the Company's Board of Directors that he had decided to resign from the Board of Directors and retire from all positions with the Company, effective February 28, 2017.  Mr. Marshall also advised the Board that his decision is not based on any disagreement with the Company on any matter relating to the Company's operations, policies or practices.  In addition, Dr. Jill Marshall, currently employed as Director of Operations, will step down effective February 28, 2017.  Mr. Marshall and Dr. Marshall will support a transition to new Company management over a period of 30 to 60 days as needed and as requested by the Board.  The Company will enter into separation agreements with the Marshalls as discussed below.

*(c)  Appointment of new Principal Executive Officer and Chairman;*

On February 27, 2017, the Company announced that the Board of Directors has appointed David A. Esposito as Chairman and Interim Chief Executive Officer effective March 1, 2017.  A copy of the press release announcing Mr. Marshall's resignation and the appointment of Mr. Esposito is filed as Exhibit 99.1 hereto and incorporated herein by reference.

Mr. Esposito has been a director of the Company since 2014.  He currently serves as President and CEO of Armune BioScience, Inc., an early stage medical diagnostics company focused on developing and commercializing unique technology for diagnostic and prognostic tests for prostate, lung, and breast cancers.  As Interim CEO of Medizone, Mr. Esposito will lead the search for commercial talent to focus the Company's efforts to raise capital for operations and to build out the Company's sales efforts in the United States market.

From 2011 to 2013, Mr. Esposito was Vice President, Commercial Operations, at Thermo Fisher Scientific.  Before joining Thermo Fisher Scientific, he was President and General Manager of Phadia US Inc., a specialty diagnostics company, from 2009 until its acquisition by Thermo Fisher Scientific in 2011.  He was employed in various positions by Merck & Co., Inc. from 1993 to 2009, including stints as Executive Director of the Respiratory Marketing Team (2006-2007), New Commercial Model (2007-2008), and US Commercial Strategy (2008-2009).  He was a combat infantry officer (Lt., US Army Infantry, 101st Airborne Division) from 1990-1993 and served in Operation Desert Storm in 1991, where he was awarded the Bronze Star Medal for combat action in Iraq. He received a BS degree in civil engineering at the United States Military Academy (West Point), and an MBA from Syracuse University.  He also completed an executive education program, Competitive Marketing Strategy Program, at The Wharton School (University of Pennsylvania).

With his appointment as the Company's principal executive officer, Mr. Esposito will no longer serve on Audit and Compensation Committees of the Board of Directors.

*(e)  Compensation Agreements*

*Interim Chief Executive Officer Employment Agreement*

The Company and Mr. Esposito entered into an employment agreement (the "Employment Agreement") dated effective March 1, 2017, with his employment to commence on the same date (the "Employment Commencement Date").  The Employment Agreement provides for the following:

> .   *Initial Base Salary* – Mr. Esposito will receive an initial base salary of $225,00 per year;

> .   *Annual Incentive Plan Performance Bonus* -- Mr. Esposito will be eligible for an annual performance bonus under an executive annual incentive plan with an initial target of 50% of his annual base salary;

Bonus payments will be payable upon achievement of targets established by the Board of Directors: (A) operating capital at levels to be determined by the Board; (B) U.S. market penetration of AsepticSure (trials and minimum sales of 10 units in the US or 20 units globally); and (C) milestones related to building and scaling commercial operations, including recruiting of experienced personnel to lead commercialization in the U.S. market.

> .   *Equity Incentive* – (A) Signing Bonus: Mr. Esposito will be granted 1,000,000 shares of restricted stock vesting upon transition as CEO, and (B) Incentive Bonus: Mr. Esposito will be granted 1,000,000 shares of restricted stock that will vest upon entry of AsepticSure into the U.S. market at levels to be determined by the Board of Directors;

- *Stock Options* – the grant of stock options dated February 26, 2014 to Mr. Esposito will be modified such that 750,000 shares shall vest effective March 1, 2017; and 250,000 shares to vest upon completion of the original milestone contained in the grant document.

- *Health Benefits* – No benefits during "interim" role. Traditional plan will be approved upon permanent CEO status.

Except for the foregoing agreements, there are no arrangements or understandings with the Company pursuant to which Mr. Esposito was appointed as its Chairman or Interim Chief Executive Officer. There are no family relationships between Mr. Esposito and any director or executive officer of the Company, or any person nominated or chosen by the Company to become a director or executive officer.

*The Separation Agreements*

In connection with the resignations of Mr. Marshall and Dr. Marshall, the Company has entered into a Waiver of Claims, General Release and Non-Solicitation Agreement dated February 28, 2017 with each of Mr. and Dr. Marshall (the "Marshall Separation Agreements"). In consideration for Mr. Marshall's general release of claims and compliance with non- solicitation and other covenants under the Marshall Separation Agreement, the Company has agreed with Mr. Marshall as follows:

- *Payments under promissory note* – The Company pay Mr. Marshall $14,000 per month (gross) as payments against amounts owed under a promissory note relating to accrued and unpaid compensation (the "Ed Marshall Note"). The total principal amount owing under the Ed Marshall Note is $1,065,189. The Company may prepay amounts owing under the Ed Marshall Note in part or in full at its option.

- *Stock Options* – Stock options granted previously to Mr. Marshall under the Company's 2014 equity incentive plan will be modified to permit exercise of such options for a period of up to three years from the date of Mr. Marshall's separation (but not beyond the original expiration date of any such grant).

The terms of the Separation Agreement entered into with Dr. Marshall are substantially the same as those of the agreement with Mr. Marshall, except that the principal amount owed under the promissory note payable to Dr. Marshall totals $444,583 and monthly payments will be $6,900 (gross).

The foregoing descriptions of the Employment Agreement and the Separation Agreements are qualified in their entirety by reference to the Employment Agreement and the Separation Agreements, copies of which are filed as Exhibits 10.1, 10.2 and 10.3, respectively, to this Current Report on Form 8-K and incorporated herein by reference.

**Item 7.01  Regulation FD Disclosure.**

We incorporate by reference herein the Press Release (attached as Exhibit 99.1) announcing the director and executive officer changes set forth in Item 5.02 above. The information in this Item 7.01 and Exhibit 99.1 attached hereto shall not be deemed "filed" for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

**Item 9.01  Financial Statements and Exhibits.**

*(d)  Exhibits*

| Exhibit Number | Description |
| --- | --- |
| 10.1 | Employment Agreement between Medizone International, Inc. and David A. Esposito dated effective March 1, 2017 |
| 10.2 | Separation and Release Agreement dated February 28, 2017, between Medizone International, Inc. and Edwin G. Marshall |
| 10.3 | Separation and Release Agreement dated February 28, 2017, between Medizone International, Inc. and Jill Marshall |
| 99.1 | Press Release dated February 27, 2017. |

https://www.sec.gov/Archives/edgar/data/753772/000118518517000483...

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Medizone International, Inc.**

By:  /s/ Edwin G. Marshall
      Edwin G. Marshall
      Chief Executive Officer

Date: February 28, 2017

EX-10.2 3 ex10-2.htm EX-10.2

**EXHIBIT 10.2**

## SEPARATION AND RELEASE AGREEMENT

THIS SEPARATION AND RELEASE AGREEMENT (this "Agreement") is made and entered into as of the 28th day of February 2017, by and between Edwin G. Marshall ("Executive"), and MEDIZONE INTERNATIONAL, INC., a Nevada corporation (the "Company").

### RECITALS

Executive's last day of employment with the Company will be February 28, 2017 (the "Separation Date"). After the Separation Date, Executive will not represent himself as being an employee, officer, agent or representative of the Company for any purpose. Except as otherwise set forth in this Agreement, the Separation Date will be the employment termination date for Executive for all purposes, meaning Executive will no longer be entitled to any further compensation, monies or other benefits from the Company, including coverage under any benefits plans or programs sponsored by the Company.

### AGREEMENT

NOW, THEREFORE, the parties hereto agree as follows:

1.        Termination of Employment Agreement. As of the Separation Date, the Employment Agreement dated July 6, 2016 ("Employment Agreement") entered into by and between the Company and Executive shall be terminated.  Notwithstanding such termination, the Employment Agreement provisions Section 7 (Confidential Information) and Section 8 (Non-Solicitation), shall survive the termination of the Employment Agreement.

2.        Payment of Salary, Reimbursement of Expenses, Etc.  On the Separation Date, Executive will receive (i) all base salary accrued and unpaid as of the Separation Date; (ii) any unreimbursed business expenses incurred by Executive on the Company's behalf; and (iii) any other amounts required to be paid under any benefit plan or program in which Executive participates or any other amounts mandated by law.

3.        Extension of Exercise Period of Stock Options.  In consideration of Executive executing and entering into this Agreement, and the covenants and releases given herein, the Company shall modify the post-termination provisions of all outstanding and unexpired stock options previously granted Executive under the Company's 2014 Equity Incentive Award Plan ("Plan") to provide that they may be exercised for a period of up to three (3) years from the Separation Date, notwithstanding the provisions of the grant documents or the Plan; *provided*, that no such award shall be exercisable after the expiration date of such award as provided in the original grant document or the Plan applicable to such award.

4.        Promissory Note Payments.  Company shall continue to make payments required under that certain Promissory Note dated July 6, 2016, of which the Company is the Maker and Executive is Holder, in the gross amount of $14,000 per month, and otherwise to honor the terms of such Note until paid in full.

5.      Taxes.  All amounts paid under Section 2 and Section 4 of this Agreement shall be paid less all applicable state and federal tax withholdings and any other withholdings required by any applicable jurisdiction.

6.      Effective Date.  The effective date of this Agreement shall be the eighth day after it has been signed by Executive.  Executive acknowledges that he would not be entitled to the extension of the exercise period of the stock options as provided in Section 3, above, absent his execution of this Agreement.

7.      General Release.

(a)      Executive, on behalf of himself and his heirs, executors, administrators, successors and assigns, and all other persons claiming by, through, or under him, hereby knowingly and voluntarily waives, releases and forever discharges the Company and all of its parents, subsidiaries, and affiliate companies, predecessors, successors, and assigns, and each of their respective current and former shareholders, directors, officers, employees, representatives, insurers, attorneys and assigns and all persons acting by, through, under or in concert with them or any of them (all of whom, with the Company, are collectively referred to throughout the remainder of this Agreement as the "Releasees"), of and from any and all claims, demands, charges, grievances, damages, debts, liabilities, accounts, costs, attorneys' fees, expenses, liens, future rights, and causes of action of every kind and nature, known or unknown, asserted or unasserted, which Executive has, may have, or claims to have against Releasees, or one or more of them, arising prior to the Effective Date of this Agreement (hereinafter collectively referred to as "Released Claims").

(b)      The Released Claims include, without limitation, (i) any claims based either in whole or in part upon any facts, circumstances, acts, or omissions in any way arising out of, based upon, or related to Executive's employment with the Company or the termination thereof; (ii) any claims or regulation, local ordinance, or the common law, regarding employment or prohibiting employment discrimination, harassment, or retaliation, including, without limitation, arising under any federal or state statute or regulation, local ordinance, or the common law, regarding employment or prohibiting employment discrimination, harassment, or retaliation, including, without limitation, the Employee understands and agrees that the foregoing release provisions waive and release Claims alleging violations of any federal or state employment discrimination law, including without limitation the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964; the Americans with Disabilities Act; the Age Discrimination in Employment Act ("ADEA"); Employee Retirement Income Security Act ("ERISA"); as well as Claims arising out of or related to violations of any other state or federal law, rule or regulation or any Claim arising out of any common law theory.

(c)      Notwithstanding the foregoing paragraphs, Executive does not release the Company from any obligations the Company may have to him with respect to the following: (i) rights to apply for unemployment compensation or worker's compensation, (ii) claims or rights which cannot be waived pursuant to applicable law, and (iii) any rights or remedies which Executive may have against the Company under the terms of this Agreement.

(d)    Nothing contained herein is intended to constitute or shall be construed as a waiver or release of Executive's right to file a charge or complaint with, or participate in an investigation by, the EEOC or any other federal or state agency. Executive is, however, waiving his right to recover any monetary award, damages or any other form of recovery in connection with such a charge or complaint, whether such charge or complaint is filed by Executive or someone else, or such an investigation. Executive further represents and warrants that he has not assigned or conveyed to any other person or entity any part of or interest in any of the claims released by him pursuant to this Agreement.

(e)    Executive represents and warrants that he has not previously signed or transferred, or attempted to sign or transfer, to any third party, any of the claims waived and released herein.

(f)    Neither this Agreement nor any benefit extended Executive pursuant to this Agreement shall be construed as or constitute an admission by the Company of any fault, liability or wrongdoing by any Releasee, nor an admission that Executive has any valid or enforceable claims or rights whatsoever against the Company or any other Releasee except as expressly provided by this Agreement.  The Company specifically denies any liability to, or wrongful act against, Executive by itself or any of the other Releasees.

8.    <u>Time for Consideration of this Agreement/Revocation</u>.  Executive further acknowledges that he is hereby given twenty-one (21) calendar days from receipt of this Agreement to consider signing this Agreement, that Executive is advised to consult with an attorney before signing this Agreement, and that Executive has the right to revoke this Agreement for a period of seven (7) days after it is executed by Executive.  In the event that Executive chooses not to timely sign this Agreement, or chooses to revoke this Agreement once signed, the option exercise period will not be extended as provided in <u>Section 3</u>, above, and Executive will not receive other consideration Executive would not be entitled to in the absence of this Agreement.

9.    <u>General Provisions</u>.

(a)    <u>Severability</u>.  If any provision of this Agreement shall be held by a court to be invalid, unenforceable, or void, such provision shall be enforced to the fullest extent permitted by law, and the remainder of this Agreement shall remain in full force and effect.  In the event that the time period or scope of any provision is declared by a court of competent jurisdiction to exceed the maximum time period or scope that such court deems enforceable, then such court shall reduce the time period or scope to the maximum time period or scope permitted by law.

(b)    <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of Nevada without regard to conflict of law principles.

(c)    <u>Dispute Resolution</u>.  All disputes and controversies arising out of or in connection with this Agreement shall be resolved exclusively by the state and federal courts located in Clark County in the State of Nevada, and each party hereto agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.  Each

party hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which such party may raise now, or hereafter have, to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Each party agrees that, to the fullest extent permitted by applicable law, a final judgment in any such suit, action, or proceeding brought in such a court shall be conclusive and binding upon such party, and may be enforced in any court of the jurisdiction in which such party is or may be subject by a suit upon such judgment.

(d)  <u>WAIVER OF RIGHT TO JURY TRIAL</u>.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY HEREBY WAIVES ITS RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  EACH PARTY HEREBY AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, OR ANY PROVISION HEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

(e)  <u>Fees and Costs</u>.  The prevailing party in any arbitration, court action or other adjudicative proceeding arising out of or relating to this Agreement shall be reimbursed by the party who does not prevail for their reasonable attorneys', accountants', and experts' fees and for the costs of such proceeding.  The provisions set forth in this Section shall survive the merger of these provisions into any judgment.  For purposes of this <u>Section</u> 9(e), "prevailing party" includes, without limitation, a party who agrees to dismiss an action or proceeding upon the other's payment of the sums allegedly due or performance of the covenants allegedly breached, or who obtains substantially the relief sought.

(f)  <u>Amendments; Waivers</u>.  This Agreement may not be modified, amended, or changed except by an instrument in writing, signed by Executive and by a duly authorized representative of the Company other than Executive.  No waiver or consent shall be binding except in a writing signed by the party making the waiver or giving the consent.  No waiver of any provision or consent to any action shall constitute a waiver of any other provision or consent to any other action, whether or not similar.  No waiver or consent shall constitute a continuing waiver or consent except to the extent specifically set forth in writing.

(g)  <u>Section 409A</u>.

(i)  This Agreement is intended to be written, administered, interpreted and construed in a manner such that no payment or benefits provided under the Agreement become subject to (A) the gross income inclusion set forth within Section 409A(a)(1)(A) of the

Code or (B) the interest and additional tax set forth within Section 409A(a)(1)(B) of the Code (together, referred to herein as the "Section 409A Penalties"), including, where appropriate, the construction of defined terms to have meanings that would not cause the imposition of Section 409A Penalties.  In no event shall the Company be required to provide a tax gross-up payment to Executive with respect to any Section 409A Penalties.

(ii)    Notwithstanding anything to the contrary in this Agreement, in-kind benefits and reimbursements provided under this Agreement during any calendar year shall not affect in-kind benefits or reimbursements to be provided in any other calendar year, other than an arrangement providing for the reimbursement of medical expenses referred to in Section 105(b) of the Code, and are not subject to liquidation or exchange for another benefit.  Notwithstanding anything to the contrary in this Agreement, reimbursement requests must be timely submitted by Executive and, if timely submitted, reimbursement payments shall be promptly made to Executive following such submission, but in no event later than December 31st of the calendar year following the calendar year in which the expense was incurred.  In no event shall Executive be entitled to any reimbursement payments after December 31st of the calendar year following the calendar year in which the expense was incurred.  This Section 9(g)(ii) shall only apply to in-kind benefits and reimbursements that would result in taxable compensation income to Executive.

(iii)    Additionally, in the event that following the date hereof the Company or Executive reasonably determines that any compensation or benefits payable under this Agreement may be subject to Section 409A of the Code, the Company and Executive shall work together to adopt such amendments to this Agreement or adopt other policies or procedures (including amendments, policies and procedures with retroactive effect), or take any other commercially reasonable actions necessary or appropriate to (A) exempt the compensation and benefits payable under this Agreement from Section 409A of the Code and/or preserve the intended tax treatment of the compensation and benefits provided with respect to this Agreement or (B) comply with the requirements of Section 409A of the Code and related Department of Treasury guidance.

(h)    Assignment.  Executive agrees that Executive shall have no right to assign and shall not assign or purport to assign any rights or obligations under this Agreement.  This Agreement may be assigned or transferred by the Company; and nothing in this Agreement shall prevent the consolidation, merger or sale of the Company or a sale of any or all or substantially all of its assets.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those specifically enumerated in this Agreement.

(i)    Parties in Interest.  Nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any persons other than the parties hereto and their respective successors and permitted assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

(j)    Construction.  The terms of this Agreement have been negotiated by the parties hereto, and no provision of this Agreement shall be construed against either party as the drafter thereof.

(k)    Interpretation.  This Agreement shall be construed as a whole, according to its fair meaning.  Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning or interpretation of this Agreement.  Unless the context of this Agreement otherwise requires, (i) words of any gender shall be deemed to include each other gender; (ii) words using the singular or plural number shall also include the plural or singular number, respectively; and (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words shall refer to this entire Agreement.

(l)    Notice.  Any notices, consents, agreements, elections, amendments, approvals and other communications provided for or permitted by this Agreement or otherwise relating to this Agreement shall be in writing and shall be deemed effectively given upon the earliest to occur of the following: (i) upon personal delivery to such party; (ii) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt; or (v) upon actual receipt by the party to be notified via any other means (including public or private mail, electronic mail or telegram); provided, however, that notice sent via electronic mail shall be deemed duly given only when actually received and opened by the party to whom it is addressed.  All communications shall be sent to the party's address set forth on the signature page below, or at such other address as such party may designate by ten (10) days advance written notice to the other parties in accordance with this Section 9(l).

(m)    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile, or by email in portable document format (.pdf) and delivery of the executed signature page by such method will be deemed to have the same effect as if the original signature had been delivered to other the parties.

(n)    Authority.  Each party represents and warrants that such party has the right, power and authority to enter into and execute this Agreement and to perform and discharge all of the obligations hereunder; and that this Agreement constitutes the valid and legally binding agreement and obligation of such party and is enforceable in accordance with its terms.

(o)    Entire Agreement.  This Agreement contains the entire agreement between Executive and the Company and there have been no promises, inducements or agreements not expressed in this Agreement.

(p)    No Admission of Liability.  Nothing in this Agreement shall be construed as an admission of liability or wrongdoing by any party to this Agreement.

(q)    <u>EXECUTIVE ACKNOWLEDGEMENT</u>.  EXECUTIVE HAS HAD THE OPPORTUNITY TO CONSULT LEGAL COUNSEL CONCERNING THIS AGREEMENT AND HAS OBTAINED AND CONSIDERED THE ADVICE OF SUCH LEGAL COUNSEL TO THE EXTENT EXECUTIVE DEEMS NECESSARY OR APPROPRIATE, THAT EXECUTIVE HAS READ AND UNDERSTANDS THE AGREEMENT, THAT EXECUTIVE IS FULLY AWARE OF ITS LEGAL EFFECT, AND THAT EXECUTIVE HAS ENTERED INTO IT FREELY BASED ON EXECUTIVE'S OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS OR PROMISES OTHER THAN THOSE CONTAINED IN THIS AGREEMENT.

7

IN WITNESS WHEREOF, the parties have executed this Separation and Release Agreement as of the date first written above.

"EXECUTIVE"

_____
Edwin G. Marshall

Address:        _____

                _____

                _____

"COMPANY"

MEDIZONE INTERNATIONAL, INC.,
a Nevada corporation

By: _____
Name:  David A. Esposito
Title:  Chief Executive Officer

Address:        350 East Michigan Avenue, Suite 500
                Kalamazoo, MI 49007
                Phone:269-202-5020
                Email: *david.esposito@medizoneint.com*

EX-10.3 4 ex10-3.htm EX-10.3

**EXHIBIT 10.3**

## SEPARATION AND RELEASE AGREEMENT

THIS SEPARATION AND RELEASE AGREEMENT (this "Agreement") is made and entered into as of the 28th day of February 2017, by and between Jill Marshall ("Executive"), and MEDIZONE INTERNATIONAL, INC., a Nevada corporation (the "Company").

### RECITALS

Executive's last day of employment with the Company will be February 28, 2017 (the "Separation Date"). After the Separation Date, Executive will not represent herself as being an employee, officer, agent or representative of the Company for any purpose. Except as otherwise set forth in this Agreement, the Separation Date will be the employment termination date for Executive for all purposes, meaning Executive will no longer be entitled to any further compensation, monies or other benefits from the Company, including coverage under any benefits plans or programs sponsored by the Company.

### AGREEMENT

NOW, THEREFORE, the parties hereto agree as follows:

1.    Termination of Employment Agreement. As of the Separation Date, the Employment Agreement dated July 6, 2016 ("Employment Agreement") entered into by and between the Company and Executive shall be terminated.  Notwithstanding such termination, the Employment Agreement provisions Section 7 (Confidential Information) and Section 8 (Non-Solicitation), shall survive the termination of the Employment Agreement.

2.    Payment of Salary, Reimbursement of Expenses, Etc.  On the Separation Date, Executive will receive (i) all base salary accrued and unpaid as of the Separation Date; (ii) any unreimbursed business expenses incurred by Executive on the Company's behalf; and (iii) any other amounts required to be paid under any benefit plan or program in which Executive participates or any other amounts mandated by law.

3.    Extension of Exercise Period of Stock Options.  In consideration of Executive executing and entering into this Agreement, and the covenants and releases given herein, the Company shall modify the post-termination provisions of all outstanding and unexpired stock options previously granted Executive under the Company's 2014 Equity Incentive Award Plan ("Plan") to provide that they may be exercised for a period of up to three (3) years from the Separation Date, notwithstanding the provisions of the grant documents or the Plan; *provided*, that no such award shall be exercisable after the expiration date of such award as provided in the original grant document or the Plan applicable to such award.

4.    Promissory Note Payments.  Company shall continue to make payments required under that certain Promissory Note dated July 6, 2016, of which the Company is the Maker and Executive is Holder, in the gross amount of $6,900 per month, and otherwise to honor the terms of such Note until paid in full.

5.        <u>Taxes</u>.  All amounts paid under <u>Section 2</u> and <u>Section 4</u> of this Agreement shall be paid less all applicable state and federal tax withholdings and any other withholdings required by any applicable jurisdiction.

6.        <u>Effective Date</u>.  The effective date of this Agreement shall be the eighth day after it has been signed by Executive.  Executive acknowledges that she would not be entitled to the extension of the exercise period of the stock options as provided in <u>Section 3</u>, above, absent her execution of this Agreement.

7.        <u>General Release</u>.

(a)        Executive, on behalf of herself and her heirs, executors, administrators, successors and assigns, and all other persons claiming by, through, or under her, hereby knowingly and voluntarily waives, releases and forever discharges the Company and all of its parents, subsidiaries, and affiliate companies, predecessors, successors, and assigns, and each of their respective current and former shareholders, directors, officers, employees, representatives, insurers, attorneys and assigns and all persons acting by, through, under or in concert with them or any of them (all of whom, with the Company, are collectively referred to throughout the remainder of this Agreement as the "<u>Releasees</u>"), of and from any and all claims, demands, charges, grievances, damages, debts, liabilities, accounts, costs, attorneys' fees, expenses, liens, future rights, and causes of action of every kind and nature, known or unknown, asserted or unasserted, which Executive has, may have, or claims to have against Releasees, or one or more of them, arising prior to the Effective Date of this Agreement (hereinafter collectively referred to as "<u>Released Claims</u>").

(b)        The Released Claims include, without limitation, (i) any claims based either in whole or in part upon any facts, circumstances, acts, or omissions in any way arising out of, based upon, or related to Executive's employment with the Company or the termination thereof; (ii) any claims or regulation, local ordinance, or the common law, regarding employment or prohibiting employment discrimination, harassment, or retaliation, including, without limitation, arising under any federal or state statute or regulation, local ordinance, or the common law, regarding employment or prohibiting employment discrimination, harassment, or retaliation, including, without limitation, the Employee understands and agrees that the foregoing release provisions waive and release Claims alleging violations of any federal or state employment discrimination law, including without limitation the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964; the Americans with Disabilities Act; the Age Discrimination in Employment Act ("<u>ADEA</u>"); Employee Retirement Income Security Act ("<u>ERISA</u>"); as well as Claims arising out of or related to violations of any other state or federal law, rule or regulation or any Claim arising out of any common law theory.

(c)        Notwithstanding the foregoing paragraphs, Executive does not release the Company from any obligations the Company may have to him with respect to the following: (i) rights to apply for unemployment compensation or worker's compensation, (ii) claims or rights which cannot be waived pursuant to applicable law, and (iii) any rights or remedies which Executive may have against the Company under the terms of this Agreement.

(d)    Nothing contained herein is intended to constitute or shall be construed as a waiver or release of Executive's right to file a charge or complaint with, or participate in an investigation by, the EEOC or any other federal or state agency. Executive is, however, waiving her right to recover any monetary award, damages or any other form of recovery in connection with such a charge or complaint, whether such charge or complaint is filed by Executive or someone else, or such an investigation. Executive further represents and warrants that she has not assigned or conveyed to any other person or entity any part of or interest in any of the claims released by him pursuant to this Agreement.

(e)    Executive represents and warrants that she has not previously signed or transferred, or attempted to sign or transfer, to any third party, any of the claims waived and released herein.

(f)    Neither this Agreement nor any benefit extended Executive pursuant to this Agreement shall be construed as or constitute an admission by the Company of any fault, liability or wrongdoing by any Releasee, nor an admission that Executive has any valid or enforceable claims or rights whatsoever against the Company or any other Releasee. The Company specifically denies any liability to, or wrongful act against, Executive by itself or any of the other Releasees.

8.    <u>Time for Consideration of this Agreement/Revocation</u>.  Executive further acknowledges that she is hereby given twenty-one (21) calendar days from receipt of this Agreement to consider signing this Agreement, that Executive is advised to consult with an attorney before signing this Agreement, and that Executive has the right to revoke this Agreement for a period of seven (7) days after it is executed by Executive.  In the event that Executive chooses not to timely sign this Agreement, or chooses to revoke this Agreement once signed, the option exercise period will not be extended as provided in <u>Section 3</u>, above, and Executive will not receive other consideration Executive would not be entitled to in the absence of this Agreement.

9.    <u>General Provisions</u>.

(a)    <u>Severability</u>.  If any provision of this Agreement shall be held by a court to be invalid, unenforceable, or void, such provision shall be enforced to the fullest extent permitted by law, and the remainder of this Agreement shall remain in full force and effect.  In the event that the time period or scope of any provision is declared by a court of competent jurisdiction to exceed the maximum time period or scope that such court deems enforceable, then such court shall reduce the time period or scope to the maximum time period or scope permitted by law.

(b)    <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of Nevada without regard to conflict of law principles.

(c)    <u>Dispute Resolution</u>.  All disputes and controversies arising out of or in connection with this Agreement shall be resolved exclusively by the state and federal courts located in Clark County in the State of Nevada, and each party hereto agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.  Each

party hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which such party may raise now, or hereafter have, to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Each party agrees that, to the fullest extent permitted by applicable law, a final judgment in any such suit, action, or proceeding brought in such a court shall be conclusive and binding upon such party, and may be enforced in any court of the jurisdiction in which such party is or may be subject by a suit upon such judgment.

(d)    WAIVER OF RIGHT TO JURY TRIAL.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY HEREBY WAIVES ITS RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  EACH PARTY HEREBY AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, OR ANY PROVISION HEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

(e)    Fees and Costs.  The prevailing party in any arbitration, court action or other adjudicative proceeding arising out of or relating to this Agreement shall be reimbursed by the party who does not prevail for their reasonable attorneys', accountants', and experts' fees and for the costs of such proceeding.  The provisions set forth in this Section shall survive the merger of these provisions into any judgment.  For purposes of this Section 9(e), "prevailing party" includes, without limitation, a party who agrees to dismiss an action or proceeding upon the other's payment of the sums allegedly due or performance of the covenants allegedly breached, or who obtains substantially the relief sought.

(f)    Amendments; Waivers.  This Agreement may not be modified, amended, or changed except by an instrument in writing, signed by Executive and by a duly authorized representative of the Company other than Executive.  No waiver or consent shall be binding except in a writing signed by the party making the waiver or giving the consent.  No waiver of any provision or consent to any action shall constitute a waiver of any other provision or consent to any other action, whether or not similar.  No waiver or consent shall constitute a continuing waiver or consent except to the extent specifically set forth in writing.

(g)    Section 409A.

(i)    This Agreement is intended to be written, administered, interpreted and construed in a manner such that no payment or benefits provided under the Agreement become subject to (A) the gross income inclusion set forth within Section 409A(a)(1)(A) of the

Code or (B) the interest and additional tax set forth within Section 409A(a)(1)(B) of the Code (together, referred to herein as the "Section 409A Penalties"), including, where appropriate, the construction of defined terms to have meanings that would not cause the imposition of Section 409A Penalties. In no event shall the Company be required to provide a tax gross-up payment to Executive with respect to any Section 409A Penalties.

(ii)    Notwithstanding anything to the contrary in this Agreement, in-kind benefits and reimbursements provided under this Agreement during any calendar year shall not affect in-kind benefits or reimbursements to be provided in any other calendar year, other than an arrangement providing for the reimbursement of medical expenses referred to in Section 105(b) of the Code, and are not subject to liquidation or exchange for another benefit. Notwithstanding anything to the contrary in this Agreement, reimbursement requests must be timely submitted by Executive and, if timely submitted, reimbursement payments shall be promptly made to Executive following such submission, but in no event later than December 31st of the calendar year following the calendar year in which the expense was incurred. In no event shall Executive be entitled to any reimbursement payments after December 31st of the calendar year following the calendar year in which the expense was incurred. This Section 9(g)(ii) shall only apply to in-kind benefits and reimbursements that would result in taxable compensation income to Executive.

(iii)    Additionally, in the event that following the date hereof the Company or Executive reasonably determines that any compensation or benefits payable under this Agreement may be subject to Section 409A of the Code, the Company and Executive shall work together to adopt such amendments to this Agreement or adopt other policies or procedures (including amendments, policies and procedures with retroactive effect), or take any other commercially reasonable actions necessary or appropriate to (A) exempt the compensation and benefits payable under this Agreement from Section 409A of the Code and/or preserve the intended tax treatment of the compensation and benefits provided with respect to this Agreement or (B) comply with the requirements of Section 409A of the Code and related Department of Treasury guidance.

(h)    Assignment. Executive agrees that Executive shall have no right to assign and shall not assign or purport to assign any rights or obligations under this Agreement. This Agreement may be assigned or transferred by the Company; and nothing in this Agreement shall prevent the consolidation, merger or sale of the Company or a sale of any or all or substantially all of its assets. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those specifically enumerated in this Agreement.

(i)    Parties in Interest. Nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any persons other than the parties hereto and their respective successors and permitted assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

(j)    Construction.  The terms of this Agreement have been negotiated by the parties hereto, and no provision of this Agreement shall be construed against either party as the drafter thereof.

(k)    Interpretation.  This Agreement shall be construed as a whole, according to its fair meaning.  Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning or interpretation of this Agreement.  Unless the context of this Agreement otherwise requires, (i) words of any gender shall be deemed to include each other gender; (ii) words using the singular or plural number shall also include the plural or singular number, respectively; and (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words shall refer to this entire Agreement.

(l)    Notice.  Any notices, consents, agreements, elections, amendments, approvals and other communications provided for or permitted by this Agreement or otherwise relating to this Agreement shall be in writing and shall be deemed effectively given upon the earliest to occur of the following: (i) upon personal delivery to such party; (ii) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt; or (v) upon actual receipt by the party to be notified via any other means (including public or private mail, electronic mail or telegram); provided, however, that notice sent via electronic mail shall be deemed duly given only when actually received and opened by the party to whom it is addressed.  All communications shall be sent to the party's address set forth on the signature page below, or at such other address as such party may designate by ten (10) days advance written notice to the other parties in accordance with this Section 9(l).

(m)    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile, or by email in portable document format (.pdf) and delivery of the executed signature page by such method will be deemed to have the same effect as if the original signature had been delivered to other the parties.

(n)    Authority.  Each party represents and warrants that such party has the right, power and authority to enter into and execute this Agreement and to perform and discharge all of the obligations hereunder; and that this Agreement constitutes the valid and legally binding agreement and obligation of such party and is enforceable in accordance with its terms.

(o)    Entire Agreement.  This Agreement contains the entire agreement between Executive and the Company and there have been no promises, inducements or agreements not expressed in this Agreement.

(p)    No Admission of Liability.  Nothing in this Agreement shall be construed as an admission of liability or wrongdoing by any party to this Agreement.

(q)    <u>EXECUTIVE ACKNOWLEDGEMENT</u>.  EXECUTIVE HAS HAD THE OPPORTUNITY TO CONSULT LEGAL COUNSEL CONCERNING THIS AGREEMENT AND HAS OBTAINED AND CONSIDERED THE ADVICE OF SUCH LEGAL COUNSEL TO THE EXTENT EXECUTIVE DEEMS NECESSARY OR APPROPRIATE, THAT EXECUTIVE HAS READ AND UNDERSTANDS THE AGREEMENT, THAT EXECUTIVE IS FULLY AWARE OF ITS LEGAL EFFECT, AND THAT EXECUTIVE HAS ENTERED INTO IT FREELY BASED ON EXECUTIVE'S OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS OR PROMISES OTHER THAN THOSE CONTAINED IN THIS AGREEMENT.

7

IN WITNESS WHEREOF, the parties have executed this Separation and Release Agreement as of the date first written above.

"EXECUTIVE"

_____
–
Jill Marshall

Address:        _____

                _____

                _____

"COMPANY"

MEDIZONE INTERNATIONAL, INC.,
a Nevada corporation

By: _____
Name:  David A. Esposito
Title:  Chief Executive Officer

Address:        350 East Michigan Avenue, Suite 500
                Kalamazoo, MI 49007
                Phone:269-202-5020
                Email: *david.esposito@medizoneint.com*